Good morning. May it please the court, Gail Ivins appearing on behalf of defendant appellant Noe Raygoza-Garcia. I think the question for the court in this case is how the evidence of the 26 non-productive stops of cars with Baja California license plates in the month that surrounded the stop of Mr. Raygoza- Garcia's car with Baja California license plate was found. And I think the question for the court in this case is how the evidence of the 26 non-productive stops of cars with Baja California license plates in the month that surrounded the stop of Mr. Raygoza-Garcia's car with Baja California  license plate was found. And I think the question for the court in this case is how the evidence of the 26 non-productive stops of cars with Baja California license plates in the month that surrounded the stop of Mr. Raygoza-Garcia's car with Baja California license plate was found. And I think the question for the court in  What we have are two unambiguous declarations from agents that were prepared in response to the first suppression motion where they state it was a single key in the ignition there were no other keys and there was no key chain. What's wrong with the way the district judge handled that in her opinion? She discussed it. She did discuss it and then she said it had some moderate and I think it has none. She gave it moderate rate. But she first talked about how it made no sense that they would have said that. So her statement on that seems internally inconsistent and there is a picture of the key and key chain in evidence. It's silver. It's large. But if we take that out, let's just go ahead and assume, I'm just assuming arguendo, we take that out. Isn't there still enough? I mean was that really that material? I mean I think that I conceded in the briefing that if we don't look at the evidence of the nonproductive stops, which I think was argued by counsel as a way to evaluate the credibility of the agents and also whether we should do the normal thing, right? The normal thing is we give deference to agents because of their experience and their training and their knowledge of the area. The fact they've done this a lot and I believe Judge Gould, as you said in Valda's, the controlling case, the en banc case, you know, we're not going to second guess the agents. But if we look at the evidence of the nonproductive stops, I think that gave the court a reason to second guess the agents and the problem is she didn't even consider it. So I agree with the court that if we don't have that, this fits within the parameters of most cases that come before this court or the Supreme Court where reasonable suspicion is found. So you don't think this is distinguishable from Valda's vega? I think it's distinguishable in a few ways. One is we're on Interstate 5, which is the traditional, you know, busy interstate highway as opposed to... Well, I mean, both of them are on Interstate 5. I mean, the... Well, they were both on Interstate 5. They were both dealt with the car with the Mexican license plate. They both dealt about 70 miles outside of the border. There was still a lot of commonality. And there was no eye contact. It was, you know, a Ford pickup truck that, you know, had large and was hard to see into. And in that case, the court found that the facts were not clearly erroneous and that the factors that the district court weighed were also found relevant by this court. It also found that the driving behavior was the most important factor, right? The speeding up and the changing lanes and all of that. And I think what's important in Valda's vega, I mean, if we don't look at the evidence of the key chain, which showed that the agents were not always as accurate as one could hope that agents would be, and if we don't look at this substantial evidence of 26 out of 27 nonproductive stops of cars with Baja license plates, well, then I think we fit into Valda's vega. But I think this, you know, we're here for argument, and I think that the distinguishing features in this case are proven erroneous statements by the agent under penalty of perjury, and this evidence of nonproductive stops, which suggests that if the agents are relying on the factors that they are relying on, maybe they know that they shouldn't be because 26 times when they stopped cars, they didn't find anything. And so we do have a situation where the facts that agents are relying on are applying to a large segment of the population that is not engaging in criminal activity, which this court has recognized is the kind of thing that, you know, we shouldn't look at profiling evidence if that's what it tends to do is capture a large segment of the population that is not engaging in criminal activity. Counsel, Judge Gould, if I could interject a question. Please help me because I don't remember everything we said in Valda's vega. But did we address the issue of unproductive stops in that case? No, Your Honor. So that wasn't part of that record? It was not part of that record. Now, are there any other circuits that have issued opinions, published opinions that address that issue? I did not find any, Your Honor. So if we were to rely on that to give your client relief, it would be a case of first impression? Your Honor, I don't think it would even so much be a question of giving him relief. I think I've argued in the alternative in the brief that the problem is, and it's at footnote six of the district court's order, the district court discounts it entirely. If the district court had weighed that factor and come to a conclusion in this court on de novo review, had then weighed all those factors, I mean, I guess this court could either weigh it now on de novo review, but I can imagine the better course would be to allow the district court, after being told it is relevant to the totality of circumstances analysis, to reconsider the issue. Because the court does give deference both to the agent's experience and training and to the district court's, the local court's experience. And obviously, Judge Phillips, now the chief judge, has a lot of experience with Riverside cases, and so she was in a good position to have that kind of experience with the local situation. So let me make sure I understand. What do you think the district court should have done with respect to the nonproductive stops? Review the methodology? What do you . . . I'm just trying to understand on the nonproductive. Well, I mean, I've argued two things, Your Honor, obviously in the brief. One is just that the fact of the nonproductive stops standing alone should have been considered. And the district court in footnote 6 says, we're not going to consider this because I've already found reasonable suspicion. And I'm saying, no, she should have included that as part of the totality of the circumstances. The second argument has to do with the fact that she did not accept the proffer, the further proffer, by defense counsel that, you know, not only is the government's own list showing 26 out of 27 nonproductive stops, there was, you know, additional evidence that he proffered that of all those stops, the entire panoply, there, you know, was no other prosecution in the central district. That was the proffer, and she didn't accept it. I see that I'm nearly out of time. Go ahead. I have a question while we're on that topic, please. So I have two questions for you on this list of other stops. First, the case law defines totality of circumstances to be limited to the stop at issue. And aren't we straying when we're looking at other stops, and I take it this would be with other officers as well, not necessarily the ones who were testifying, and who, by the way, the trial judge would have had the better position to judge credibility, especially as you note, and I think as the other side will concede, there are some credibility issues here because of the differences of testimony. Then number two is, how do I look at that? Is it properly authenticated? Is this really a judicial notice issue? Isn't there a sufficient ground to say that even if it is appropriate to consider it, it wasn't properly established for taking judicial notice? As to number one, the exhibit itself, Exhibit 123, which I apologize that I only provided to the court last night, is fundamentally similar, obviously, to what the government submitted in their excerpt. I thought it was the same. I apologize. The exhibit itself was admitted into evidence by the judge. So that part is part of this record. I think that how it fits in is that these are all agents who are stationed at the Murrieta checkpoint. Part of the argument about the proffer goes to there should have been more development, but just standing alone, I guess there's just standing alone the nonproductive stops themselves by agents who are all working at the same checkpoint, I think there's an inference that would have been available to the district court had she considered that evidence, that those agents would obviously have known about that. I mean, it's who they're working with, it's what they're doing every day, and out of 27 stops that those agents made in a month, only one of them was productive. I see I'm out of time. Thank you. Good morning, Your Honors. May it please the court. Bram Alden for the United States. I'd like to start with the issue of the nonproductive stops, because I think that's a very serious mischaracterization of what this document actually shows. At the hearing, defense counsel, quote, proffered that this list of approximately 180 border patrol stops in the month period surrounding defendant stops all reflected that there were no other federal criminal prosecutions resulting from these stops. Is that apparent on the face of the document? Not at all, Your Honor. In fact, when defense counsel was asked how he arrived at that conclusion, he said that he went on to the Central District of California CMECF system, he ran unspecified case numbers through that system, he looked at unspecified filings, and in some unspecified manner determined that those filings did not have to do with interdiction stops or border patrol cases. The district court judge, and I would hope this court would find that that was woefully inadequate to establish that this document showed anything. Then a single border patrol agent was questioned about this list of stops, and defense counsel elicited from that border patrol agent that he did not know whether any of the other stops on this list actually resulted in federal criminal prosecutions. But as the government pointed out, the fact that one agent did not know that doesn't establish that they didn't result in federal criminal prosecutions. It doesn't establish that they didn't result in seizures of contraband that then were part of a larger prosecution, were part of a larger investigation, or simply in the exercise of prosecutorial discretion resulted in no prosecution. So to call these unproductive stops is just deriving from the document something that it does not remotely establish. In addition to that, I would like to address the key chain issue, and I will concede, Your Honor, that there are credibility issues given that some of the I do think that as Judge Merguia and Judge Zuhara, you pointed out, the district court judge took that into account. She had these agents testify. They were cross-examined. They were impeached to the extent that this evidence had impeachment value, and ultimately, she determined that she would still give the key chain evidence only moderate weight. Let me ask you about that, though, because it does look like the credibility of the agents was put into question regarding the key chain testimony. And so I guess my question to you is why shouldn't that shade their entire testimony? So, Your Honor, I would say that obviously under this court's standard of review, the credibility determination that the district court made looking at their entire testimony is something to which this court gives substantial deference. And the district court may indeed have found that that key chain testimony did shade their entire testimony, but ultimately, she determined in the exercise of her discretion that despite the inconsistencies or muddled nature of that testimony, that she still found the agents, quote, more credible on balance. So I don't disagree that it might very well shade their entire testimony, but the district court took that into account over the course of two evidentiary hearings. So ultimately, that finding should be something that this court respects. And we shouldn't scrutinize that she gave it moderate weight when it looked like there probably some judge might have given it zero weight. So she actually said that it was questionable and that she would give it moderate weight. I think if this court is uncomfortable with the notion of it being given even moderate weight, that it can absolutely discount it entirely. Because even if that one piece of evidence is discounted from the analysis, there is still ample evidence to support reasonable suspicion, which of course, as this court, Judge Gould, writing for the court in Valdez-Vega said, is not a particularly high threshold to reach. And consistent with Valdez-Vega, as well as Robles-Amaro, and the other cases cited in the government's brief, the reasonable suspicion threshold was amply satisfied here based on evidence that this car had crossed the border multiple times in the preceding month, that it had been sent to secondary inspection at least four times in the preceding two weeks. Isn't that consistent with maybe a commuter from Mexico coming to the United States? It may well be, Your Honor. And as this court and the Supreme Court have pointed out, even innocent conduct can be part of the totality of the circumstances. One factor that I would think is entitled to extreme weight here is the fact that on the very day of this stop, the defendant was not the individual who drove the car across the border, which I think is not consistent with a commuter coming to the United States. And this car was stopped less than two hours after it crossed the border. And if I understand that correctly, because I think that is not insignificant, that morning, just to make sure I understand, there was on the records that that car had crossed the border, is that right? Yes, Your Honor, at approximately 9.41 a.m. And there was a name given when that car crossed? My understanding is that there was actually a photograph of the driver who had The agents before they conducted this traffic stop saw that photograph, because, of course, there were two agents in the car. Agent Rivera is driving. Agent Aguayo is looking at the records. Before conducting the stop, they looked at the photograph of the driver who drove the car across the border, and they looked at defendant driving the vehicle and could tell from that that that was not the same person. So prior to the stop, and this is, of course, at approximately 11.30 a.m., so. Because the way I read it, and that's how I wanted to clarify, I thought there was no photo of that car or the driver that morning. I thought he got a name, and he looked up that person's name, and that person was different, looked different than the person he identified as driving the car. It may be, Your Honor, that they looked at the name and then matched up that name with a person who had driven the car on previous instances, but my understanding from their declarations was that they did indeed pull up a photograph. And if you would allow me just a moment, and I see my time is running out, but I think that this is an important point I would like to just look back very quickly. Okay. Thank you. So in their testimony during the hearing at ER 147, which I appreciate my colleague points out here, the witness said that they were able to compare a name based on the previous crossing, and it matched the same person. However, I think that there's also a statement in the declarations, which the government included at GER 28 would be the first declaration, and that is Agent Rivera's declaration, which then refers to Agent Aguaya's declaration. So in Agent Aguaya's declaration at page GER 36, he writes that, I was able to pull up photographs from one of the NEON's previous border crossings. I saw that the person who was driving the NEON and the person who had previously crossed the border in it were not the same person. So my understanding is that he looked at the name, matched that name with a person who had previously crossed, pulled up a photo of that person, and then used that evidence. He didn't see a picture that morning of who crossed. I don't believe he saw. I believe, Your Honor, that the record shows that he saw the name of the person who crossed that morning, matched up that name with a picture of that same person. And I'm not sure there's an appreciable difference, but I wanted to clarify that. I guess my trouble is with the evasive sort of description that is given by the officers in light of how their credibility was challenged. I mean, we have them that they were holding the steering wheel tight from the car that they were driving. They could see, I guess, somehow the pressure that was being put. And this kind of behavior is what I think any other commuter might, I mean, even if they could tell that it was holding the steering wheel tight, just not sure those factors deserve the weight that they might be given by the government or maybe even the district court in this context. My response to that would be to say that these are things that are pointed out in a number of cases as factors that can weigh in favor of a reasonable suspicion finding, and that, of course, the totality of the circumstances has to look to everything. And if that factor doesn't convince the district court or this court alone that that was sufficient, that is not a divide-and-conquer analysis in which that factor alone should be the deciding factor. Rather, the court should look at everything, and everything here exceeds, if not certainly meets, the kinds of factors that this court and the Supreme Court have held to satisfy the reasonable suspicion standard. I see that my time is up. I'm going to follow up, if I may, with you on what Judge McGee had just tossed at you. Many of the facts relied on by the police here do seem to be quite general, general such that they could cast suspicion on large segments of the population, such as the fact that the vehicle crossed the border, the vehicle had Mexican license plates, the defendant appeared nervous driving past the law enforcement. I mean, that last one I always find interesting because I suppose most of the people in this room take their foot off the accelerator or hit the brake when they see a patrolman off the interstate that might be watching them. So considering the general observations of the officers, and also, as you point out, there are some credibility issues and some specific observations, should we be concerned that this particular case is watering down the reasonable suspicion analysis or encouraging, one could take it a step further, ethnic profiling by deferring to, I'll call, inferences that officers make on some standard observations? No, Your Honor, and the reason I say that is because I actually think this case exceeds most of the other cases in which this court has held that reasonable suspicion was satisfied. The reason I say that is because there are actually a lot of unique factors in this case. The fact that this car had been sent to secondary inspection multiple times and that the agents pointed out that smugglers will often drive a car with empty compartments or that doesn't arouse officers' suspicion across the border multiple times in order to make Border Patrol agents accustomed to seeing that car. That's another one, though, where if they found contraband, they'd say, Aha, see, that car had contraband, so we're going to stop it again. And now they can say, Aha, see, it passed and didn't have any, so we're going to stop it. That's sort of a... I agree, and all of the cases that this court and the Supreme Court have decided... If you agree, then how is that a factor that's reliable and one that should be considered? I agree that it could be interpreted as innocent conduct or it could be interpreted as a sign of criminal conduct. And this court and the Supreme Court have held that the fact that something may, in its discreet nature, be innocent does not mean it's discounted from the reasonable suspicion analysis where a Border Patrol agent, based on his experience or her experience... How far do we take it? I mean, because you can say that about the law... If they look at the police officers and they don't look at the police officers, sometimes it's like, oh, they averted their eyes, so that's suspicious. Oh, they looked at us, so that's suspicious. It's the same thing as the key here in large response. And I'm just... These general characteristics are reasons that can be attributed to the general public. And I understand what our case law is. I was on the original panel of Valdez Vega, and I understand it went en banc, and there were some distinguishing things that were taken up there in the majority of the court. But I still have some concerns about these characteristics that can be attributable to the general public, to anybody driving in response to the police officer. Here there may be some additional things, but, you know, to be able to use them both as a shield and a sword is really a little bit troubling. Well, I would refer back again to the things that I think are unique about this case. The fact that the defendant was not the person who drove across the border that very morning in that vehicle. The fact that it was close to the border, which is not unique, I admit, but it is something that is part of the reasonable suspicion calculus. And the fact that he didn't just slow down the way an average or ordinary driver might, but that, according to the agents, he slowed down three times, ultimately going as much as 25 miles per hour below the speed limit and forcing other cars to drive around him. If other cars were all slowing down in the presence of Border Patrol agents, they wouldn't have been driving around the defendant's vehicle. The fact that the car that he was driving had Mexican license plates, while that might be innocent, it also is something that is part of the calculus. The fact that he had a rigid, upright posture might also be innocent, but yet has been held time and again to be part of the calculus. And ultimately what it comes down to is that these are experienced agents who are entitled to rely on their training and experience. And if the notion is that anything that they customarily see is, quote, boilerplate or somehow discounted, that would be eradicating the rule that they should be looking to a pattern or practice of certain factors to determine, based on their experience, that those things indicate to them that there is reasonable suspicion, which again, of course, is a very low threshold to meet. Thank you. Let me see if Judge Gould has any further questions. I have one question to take you back to the appellant's argument about unproductive stops. And that question relates to whether there's anything in the record that would tell us, in your district, in what percentage of stops where contraband is found, are there actual prosecutions as opposed to some exercise of discretion where there are not prosecutions. I don't want to know anything based on supposition or your knowledge of it. It's not in the record, but I wanted to know if the record tells us. There's nothing I'm aware of, Your Honor, in the record as to that question. There's nothing I'm aware of. Okay. Thank you. Thank you. Thank you for the court's time. Thank you. I don't know how much time we have, but... Actually, I'll give you two because we went way over with that. Thank you. Just a few quick points. The list, Exhibit 123, was provided by the government in response to a discovery request. I don't think it's included in the ERs. It's Clerk's Record 112 at page 11. The court said, The defendant contends the modified historical data is material to enable him to determine whether Border Patrol agents at the Muria Station were doing stops just due to the license plate. The court agrees, and she ordered the discovery. So that's where that list came from. And on that list, the number of arrests is apparent. So that's where my argument about nonproductive. There was one arrest out of 27 stops. Counsel, Judge Gould, could you please answer the question I asked your friend on the other side of the case? Absolutely, Your Honor. Is there anything in the record that tells us in what percentage of cases in their district they prosecute when contraband is found? The only thing in this record, Your Honor, is the statement by the agent, Agent Rice, at ER 215 to 216, that he, as one of the three liaison agents who worked between the Muria Station and the U.S. Attorney's Office, that he was not aware of any other federal prosecutions based on any of the stops in Exhibit 123. And then the defense counsel's proffer at ER 216 to 218, where he said he looked at the cases that came before this case and the cases that came after this case on the PACER ECF system, and those cases were outside the timeframe of Exhibit 123. Counsel, I understand that, but what you're doing is talking about the number of cases where there weren't prosecutions. My question is whether there's any data in the record that tells us in what percentage of cases, where they find contraband, they do not prosecute. I understand, Your Honor. I apologize. No, there is no evidence in the record on that question. And indeed, the only case where there was an arrest and therefore an inference of contraband found in this timeframe was Mr. Regosa-Garcia's case. So I don't know that we have anything to compare it to. The counsel said that it was an unspecified search by Mr. Rafael, but he did specify the framework of his ECF PACER search, specifically at 216 to 218. And then the one key evidence, Judge Phillips gave it moderate weight. She called the driving behavior, she gave that some weight. And so I don't know how we compare and contrast those, but she clearly had some questions about their credibility. And opposing counsel already gave you the sites for the issue of whether there was a picture on the day of. And if the Court has no further questions, thank you. Thank you very much. Do you have any further questions, Judge Gould? No questions here. Thank you. Thank you very much for your presentations here this morning. The case of United States v. Noah Regosa-Garcia is now submitted.
judges: Gould, Murguia, Zouhary